ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL XI

| MARCEL AIRANDO TORRES<br><br>QUERELLANTE-RECURRENTE<br><br>V.<br><br>PARÍS AUTO SALES, INC.<br><br>QUERELLADOS-RECURRIDOS | KLRA202400671 | *REVISIÓN JUDICIAL* procedente del Departamento de Asuntos al Consumidor<br><br>Caso Núm.:<br>MAY-2023-0003451<br><br>Sobre:<br><br>COMPRA VENTA DE VEHÍCULOS DE MORTOR |

Panel integrado por su presidenta, la juez Brignoni Mártir, la jueza Álvarez Esnard, y la jueza Prats Palerm

Brignoni Mártir, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 22 de mayo de 2025.

Comparece Paris Auto Sales, Inc. (Paris Auto o parte recurrente) mediante un *Escrito de Revisión Judicial*. Nos solicita la revisión de la *Resolución* emitida el 4 de octubre de 2024, notificada el 7 de octubre de 2024, por el Departamento de Asuntos del Consumidor (DACo). En virtud del referido dictamen, la agencia dictaminó que el vehículo de motor adquirido por el Marcel Airando Torres (señor Airando Torres o parte recurrida) presentó vicios ocultos. Así establecido, ordenó la resolución del contrato de compraventa más la compensación monetaria a favor de la parte recurrida por el pago efectuado en la adquisición del automóvil, los daños experimentados por angustias mentales y la pérdida de ingresos. Decretó, a su vez, que se le concediera una suma adicional de $3,607.06 en concepto de daños y perjuicios por la compra de una motora y demás gastos relacionados con esta adquisición.

Por los fundamentos expuestos a continuación, **modificamos** la *Resolución* recurrida a los fines de eliminar las cuantías concedidas en concepto de daños y perjuicios tras la compra de una motora y demás

gastos relacionados. Así modificada, **confirmamos** el resto de la determinación objeto de revisión judicial.

**I.**

El 11 de septiembre de 2023, el señor Airando Torres radicó una *Querella* enmendada[1] en contra de Paris Auto ante el DACo. En síntesis, alegó que el 4 de enero de 2023 adquirió el vehículo de motor Lexus GX470 (2005) por el precio cierto de $8.869.00 en virtud de un contrato compraventa. Aseveró que como parte del acuerdo entregó su unidad vehicular Kia Sorento (2003) en *trade-in* por el crédito de $1,500.00*.* No obstante, indicó que al día siguiente de la compraventa, notó un desperfecto mecánico al conducir el vehículo, que luego fue certificado como una falla en la transmisión. Por tales circunstancias, adujo que tuvo la necesidad de adquirir una motora valorizada en $2,000.00, entre otros gastos relacionados, a saber: (1) indumentaria de equipo motorista, (3) marbete, (4) sellos y comprobantes, (5) el costo de los exámenes teóricos y prácticos, (6) un alquiler a corto plazo. En vista de ello, peticionó el pago de $20,490.50. en concepto de los gastos incurridos y en daños y perjuicios.

En respuesta a tales alegaciones, Paris Auto presentó una *Moción de Desestimación de Querella* en la que argumentó que el automóvil del querellante presenta 126,005 millas corridas.[2] No obstante, aseguró que el DACo no ostenta jurisdicción debido a que el Reglamento 7159 de Garantías de Vehículo de Motor dispone un límite de 100,000 millas para atender el reclamo. Arguyó, también, que el automóvil se vendió sin garantía según pactado en el *Contrato de Renuncia a la Garantía y al Derecho de Saneamiento*. A base de tales señalamientos, solicitó la desestimación del pleito instado en su contra.

---

[1] Surge del expediente administrativa que el querellante enmendó en cuatro ocasiones su querella presentada originalmente el 17 de enero de 2023. En aras de despejar cualquier duda, destacamos que enmendó su reclamo en las siguientes fechas: (1) el 1 de febrero de 2023, (2) el 6 de marzo de 2023, (3), el 1 de mayo de 2023, y el 11 de septiembre de 2023.
[2] Este documento consta en la copia certificada del expediente administrativo.

Luego de una serie de acontecimientos procesales, cuyo tracto no pormenorizaremos, la agencia celebró tres vistas administrativas a la cual comparecieron las partes acompañadas de sus representantes legales.

Evaluada la prueba desfilada, el 4 de octubre de 2024, el DACo emitió *Resolución*, notificada el 7 de octubre de 2024, en la que declaró *Ha Lugar la Querella*. [3] Consecuentemente, dictó *No Ha Lugar* la desestimación solicitada por Paris Auto. [4] En su ejercicio adjudicativo, formuló setenta y nueve (79) determinación de hechos:

**1. La parte querellante, Marcel Airando Torres, reside en el pueblo de Sabana Grande.**

**2. La parte querellada, Paris Auto Sales, Inc. dealer querellado, publicó en la página web, "clasificados online", la oferta de venta de un vehículo de motor usado marca Lexus modelo GX 470 del año 2005, con un millaje recorrido de 136,005. El anuncio estableció lo siguiente:**

**"2005 Lexus GX 470 4x4, piel, sun roof, aros de lujo, estribos, power Windows, power Windows, power locks, radio, cd, fog lights, comoda para 7 pasajeros, lifter, aire frío, marbete al día, buena de mecánica, carrocería, pintura, marbete al día. Aceptamos trade-in, solo venta en efectivo, Visa, Ma[s]ter Card, Discover, ATN. Aceptamos trade-in, escucho oferta razonable. Se vende "as is" como est[á], sin garantía. Llame Marcel P[é]rez 787-317-1772".**

**3. El querellante se interesó por el vehículo anunciado, y se comunicó por mensaje de texto con el Sr. Marcel Pérez, al número de teléfono de la publicación de "clasificados online".**

**4. El precio del auto era $10,995.00.**

**5. El querellante entregaría una Kia Sorento en concepto de "trade-in".**

**6. El querellante y el querellado, a través de Marcel Pérez negociaron el precio del auto a $10,000,00 sujeto a que el querellado probara el vehículo que entregaría el querellando en "trade-in". El precio no se redujo porque el querellante renunciaría a vicios ocultos o garantías.**

**7. El 31 de diciembre de 2022, el querellante acudió al dealer querellado a observar y probar el auto objeto de la controversia. El querellante probó el vehículo de motor por 5 minutos. El querellante se percató que la pintura estaba desmerecida, y no sintió problema de motor ni transmisión. Durante su visita al dealer querellado, el quelante preguntó al vendedor, Marcel Pérez, si el auto estaba bueno de transmisión y de la correa de tiempo. El vendedor le indicó que estaba buena de mecánica, que de correa de tiempo no sabía. Al decirle el vendedor al querellante que la unidad estaba buena de mecánica, el querellante aceptó comprar el mismo.**

**8. El vendedor y el querellante acordaron el precio del auto en $10,000.00, el querellante entregaría al querellado la suma de**

---

[3] Apéndice de la parte recurrente, págs. 1-29.
[4] Apéndice de la parte recurrente, pág. 2

**$8,689.00 y el auto Kia Sorento de 2003 en concepto de "trade-in", por el cual se acreditaría $1,500.00. La suma de $8,689.00 se desglosaban, $8,500.00 por el auto y $189.00 por el traspaso.**

**9. El día 4 de enero de 2023, la parte querellante adquirió del dealer querellado, el vehículo de motor usado marca Lexus modelo GX 470 del año 2005, con un millaje recorrido de 136,005.**

**10. La parte querellante, pagó la cantidad de $8,689.00 a través de su cheque, y se le acreditó $1,500.00 por el vehículo de motor usado marca Kia modelo Sorento del año 2003. El querellante pagó por el cheque $5.00.**

**11. El contrato de compraventa estableció entre otras cosas lo siguiente:**

**Sold "As Is" (iniciales del querellante al lado MAT)**
**Sin garantía (número de seguro social del querellante)**
**Fecha de nacimiento de querellante**
**Número de licencia de querellante**

**12. Ese mismo día 4 de enero de 2023, el querellante firmó el documento intitulado: CONTRATO DE RENUNCIA A LA GARANTÍA Y AL DERECHO DE SANEAMIENTO, el cual establecía lo siguiente:**

*Favor de leer antes firmar*

*Certifico que:*

*1. Durante el día de hoy <u>4 de enero de 2023,</u> libre y voluntariamente, he seleccionado el siguiente vehículo de motor:*

> *<u>Lexus   GX470   2005   136005   5ptas       azul</u>*
> *Marca   Modelo   Año   Millaje   Carrocería   Color*
>
> *<u>JTJB120X850071377 GDM 320  22-0047</u>*
> *Número de serie          Tablilla      Stock*

*2. El precio de venta sugerido al consumidor Sin GARANTÍA, el cual estaba pegado en el cristal delantero del vehículo usado, era de <u>$10,995</u>.*

*3. El precio sugerido de venta se redujo, A MI OPCIÓN. La diferencia en precio se debe A MI RENUNCIA AL DERECHO A LA GARANTÍA DEL REGLAMENTO DE VEHÍCULO DE MOTOR emitido por el [D]epartamento de [A]suntos del Consumidor (D.A.C.O.) y al DERECHO DE SANEAMIENTO POR VICIOS OCULTOS, de seis meses desde la entrega del vehículo; derecho que se encuentra en el [C]ódigo [C]ivil de Puerto Rico de 1930. VICIOS OCULTOS son todos aquellos desperfectos mecánicos y de hojalaterías y pintura que no vemos a simple vista.*

*4. Fui advertido por el vendedor de que tenía derecho a traer un perito MECÁNICO para que inspeccionara el vehículo antes de comprarlo.*

*5. He probado el vehículo y acepto las condiciones ASÍ COMO ESTÁ.*

*6. Al inspeccionar el vehículo, la corporación de Yiyi Motors me informó POR ESCRITO, entre otros de los siguiente VICIOS O DEFECTOS:*

- ▪ *Este automóvil fue financiado por una compañía leasing.*
- ▪ *Este automóvil era de alquiler.*
- ▪ *Este automóvil era taxi.*
- ▪ *Este automóvil era de transportación pública.*
- ▪ *Este automóvil era de demostración.*
- ▪ *Este automóvil fue chocado y reparado.*
- ✓ *Este automóvil tiene más de 100 mil millas.*
- ▪ *Este automóvil tiene el motor desgastado por el uso y el cliente se hace responsable de repararlo.*
- ▪ *Este automóvil tiene la transmisión defectuosa.*
- ▪ *Este automóvil tiene el diferencial defectuoso.*
- ▪ *Este automóvil tiene el cristal roto.*
- ▪ *Este automóvil no pasa inspección.*
- ▪ *Este automóvil tiene el sistema de emisión de gases defectuoso.*
- ▪ *Este automóvil tiene el sistema de frenos defectuoso.*
- ▪ *Este automóvil tiene la marca millas defectuoso.*
- ▪ *Este automóvil tiene los compactos y chasis reparados.*
- ▪ *Este automóvil tiene el eje impulsor defectuoso.*
- ▪ *Este automóvil tiene el radiador y abanico del radiador defectuoso.*
- ▪ *Este automóvil tiene el aire acondicionado dañado.*
- ▪ *Este automóvil se calienta.*
- ▪ *Este automóvil humea, porque mezcla ACEITE con AGUA.*
- ✓ *Otros: Se vende como est[á] sin ningún tipo de garantía (iniciales del querellante MAT)*

*7. No tengo derecho a la DEVOLUCIÓN del dinero una vez se firme el contrato y se me entregue el vehículo.*

*8. Acepto que para poder usar el vehículo de motor hay que invertir dinero adicional en mantenimiento, sustituir o arreglas piezas defectuosas y desgastadas por el uso norma.*

*9. Las condiciones promedio del vehículo, que he seleccionado LIBRE Y VOLUNTARIAMENTE, son similares a un vehículo de igual año y millaje.*

*10. Renuncio al derecho de reclamar por defectos en titularidad del automóvil. El saneamiento por evicción incluye gravámenes, ventas condicionadas, deudas, multas, seguro de responsabilidad obligatorio, diferencias y/o alteraciones de números de series, caja, año o motor entre el vehículo, licencia o título.*

*[11][5]. Acepto pagar honorarios de abogados de iniciar una acción judicial.*

*CERTIFICO HABER RECIBIDO Y LE[Í]DO COPIA DE ESTE DOCUMENTO.*

*En Bayamón, Puerto Rico, hoy 2 de ENERO de 2023.*

*Firma                                                    Firma*
*Representante de Yiyi Motors          Comprador*

---

[5] Notamos un error en la secuencia de la enumeración respecto a esta determinación de hechos que alude a prueba documental. Así lo modificamos e indicamos para facilitar la comprensión lectora.

**13. El documento de Contrato de renuncia al derecho a saneamiento, no marcaba como vicio o defecto que la transmisión estuviera defectuosa.**

**14. Al momento de firmar el documento de Contrato de renuncia a derecho a saneamiento, no se le explicó al querellante porque indicaba Yiyi Motors.**

**15. El vendedor no se le explicó al querellante qué significaba vicio oculto.**

**16. Relacionado al documento de Contrato de renuncia al derecho de saneamiento, el vendedor del querellado le indicó al querellante que estuviera tranquillo que eso era algo administrativo, que no se preocupara.**

**17. El querellante leyó el Contrato de renuncia al derecho a saneamiento, sin embargo, no entendió el mismo, no estaba claro qué significaba el documento. El querellante entendió que vicio oculto era lo que veía u observar y lo que experimentaba el auto. El querellante s[í] comprendió que el auto no tenía garantía.**

**18. El día 4 de enero de 2023, el querellante se llevó el auto adquirido.**

**19. El día 5 de enero de 2023, el querellante al poner en neutro el vehículo adquirido, este se quedó "patinando" luego no lo volvió hacer.**

**20. El 6 enero de 2023, el vehículo volvió a "patinar", presentó un golpe fuerte y temblaba fuerte al correr. El querellante decidió escribirle un mensaje de texto al vendedor del querellado, Sr. Pérez, explicándole lo que presentaba el auto. El Sr. Pérez le contestó que la unidad se vendió sin ningún tipo de garantía, como está, y que se le dio un buen descuento.**

**21. Luego del 6 de enero de 2023, el auto encendió "check engine".**

**22. El 6 de enero de 2023, el querellante adquirió para el vehículo objeto de la querella, wipers, manga de radiador y clips plásticos por los que pagó $33.70.**

**23. El 7 de enero de 2023, el querellante adquirió aceite, bandeja de aceite, wiper trasero, pagando por estos $61.63 para el auto adquirido. El 7 de enero de 2023, el querellante adquirió filtro de aire acondicionado por la suma de $35.68 para el auto adquirido. Además, ese mismo día el querellante llevó el auto adquirido para limpieza de aire acondicionado de cabina, por la que pagó $30.00.**

**24. El 9 de enero de 2023, el querellante adquirió un filtro de aceite por la cantidad de $5.58 para su vehículo adquirido.**

**25. El día 10 de enero de 2023, el querellante llevó el auto al dealer Lexus de Ponce para realizarle un diagnóstico. Lexus de Ponce emitió un diagnóstico señalando lo siguiente:**

*"C/I unidad da golpe al aplicar cambio en la mañana. Se inspeccionó unidad con scanner indicando código P2714 pressure control selenoid D performance stuck off unidad al colocar cambio no aplica el cambio rápido y da golpe fuerte al aplicarlo. Procedimiento indica realizar pruebas abriendo la transmisión y medir resistencia a la válvula eléctrica que se encuentra en el cuerpo de válvulas y de la transmisión se orientó a cliente sobre este detalle se recomienda reemplazo de la transmisión por tiempo y millaje.*

*C/I Vibración en la unidad mientras conduce[.]*

*Se corrió unidad la misma no duplic[ó] condición descrita por el cliente.*

*Terminales de rack & pinion requieren atención inmediata[.]*

*El precio de reparación fue estimado por $6,797.66, cantidad que incluyó el impuesto.*

*El querellante pagó $146.62 por el diagnóstico.*

26. El 11 de enero de 2023, el querellante llevó el auto a Euro Maitenance Solutions, donde el estimado de la reparación de transmisión fue de $1,687.80. El querellante pagó $60.00 por el diagnóstico.

27. El 13 de enero de 2023, el querellante llevó el vehículo a Reparaciones Transmisiones PR.com, donde emitió el siguiente diagnóstico:

*"Cuando su transmisión se tarde en coger los cambios por la mañana patina y se debe a que los sellos se ponen duros. Por lo tanto, no es hasta que se calienta el aceite que logran suavizar un poco para sellar y poder levantar presión.*

*Ese fallo va progresando y cada vez tardan más. En el mejor de los casos un día no agarra cambio ni fría ni caliente. En el peor, eventualmente hace la fuga de presión cuando el vehículo va en movimiento y puede ocasionar roturas más grandes. Que igual se arreglan, pero terminan costando más que es lo que uno desea evitar.*

*Por otro lado, el desgaste interno que va generando la unidad crea un sedimento y esmeril que va tapando el sistema de lubricación y tracando el cuerpo de válvulas y sus solenoides.*

*De ahí se desprende que el diagnóstico está generando el Código P2714 relacionado al solenoide de presión.*

*Dicho solenoide controla la presión dentro la unidad y es indispensable para su buen funcionamiento y desempeño. A esos efectos, se recomienda detener la unidad para evitar que sufra daños mayores o que el fallo se extienda a otros solenoides".*

*El costo de reparación estimado fue de $4,615.50.*

28. El día 17 de enero de 2023, el querellante presentó la querella de epígrafe ante este Departamento.

29. El 19 de enero de 2023, el querellante adquirió el marbete del vehículo adquirido por el que pagó $5.00 por la venta de marbete, $11.00 por la inspección, y $180.00 por los derechos requeridos por DTOP, para un total de $196.00.

30. Debido a que no podía usar el auto adquirido, el querellante comenzó a ausentarse a su lugar de trabajo en la UPR de Mayagüez, donde labora como diseñador gráfico. El querellante gana $79.50 por día en su trabajo.

31. El querellante, ante la situación del problema de transportación, solicitó el Teletrabajo a su patrono. El mismo fue concedido desde el 24 de enero de 2023 al 23 de marzo de 2023, y del 11 de abril de 2023 al 21 de mayo de 2023.

32. Antes de que el querellante se encontrara en teletrabajo, este se ausentó a su trabajo por razón de licencia ordinaria los días 19 y 20 de enero de 2023 por el problema con el vehículo.

33. Durante el teletrabajo desde el 24 de enero de 2023 al 23 de marzo de 2023, el querellante se ausentó 9 días y 5 horas de trabajo por licencia ordinaria, por problemas con el auto.

34. El 21 de marzo de 2023, este Departamento notificó a la parte querellada 4 enmiendas a querellas presentadas por la parte querellante.

35. Durante los días 24, 29 y 31 de marzo de 2023, y 3, 5 y 10 de abril de 2023, el querellante se ausentó por licencia ordinaria, por problemas con su auto, en dichas fechas el querellante no se encontraba en el teletrabajo.

36. Durante el teletrabajo desde 11 de abril de 2023 al 21 de mayo de 2023, el querellante se ausentó 6 días de trabajo por licencia ordinaria.

37. El día 25 de abril de 2023, el querellante adquirió una motora marca Kawasaki modelo Vulcan 900 c del año 2006, por la cantidad de $2,000.00, pagados en efectivo al Sr. José Cardona. El querellante tenía unos ahorros por $2,000.00 que utilizó para la compra de la motora ante la falta de transportación porque no podía utilizar el auto adquirido. El vendedor le entregó dos llaves de la motora.

38. El querellante conocía que la motora adquirida presentaba algunos problemas.

39. Luego de 21 de mayo de 2023, la UPR de Mayagüez no renovó la solicitud de teletrabajo presentada por el querellante.

40. El 23 de mayo de 2023, el querellante se ausentó a su trabajo por licencia ordinaria.

41. El 2 de junio de 2023, este Departamento, a través del Técnico Automotriz, Anuedi Ríos Feliciano, llevó a cabo una inspección del auto objeto de la querella. Ese mismo día, 2 de junio de 2023, el Técnico emitió un Informe en el cual señaló, entre otras cosas, lo siguiente:

*"El 2 de junio de 2023, a las 10:00 AM se realizó una inspección conjunta en la residencia de la parte querellante. Al momento de la inspección la unidad objeto de la querella no presentó fallo en la transmisión cuando estaba fría. Se realizó prueba de carretera para verificar si presentaba algún gallo cuando calentaba. La unidad objeto de la querella no presentó ningún fallo cuando calentó. En la prueba de carretera estuvieron presentes el querellante y este funcionario.*

*Millaje antes de inspección 138014*

*Millaje luego de inspección 138028".*

42. El 29 de junio de 2023, este Departamento, a través del Técnico Automotriz, Anuedi Ríos Feliciano, llevó cabo una re-inspección del auto objeto de la querella.

43. El día 10 de julio de 2023, este Departamento notificó el Informe de la Inspección realizada, en esta, el Técnico señaló entre otras cosas lo siguiente:

*"El día 29 de junio de 2023 a las 10:00 AM se realizó una inspección conjunta en la residencia de la parte querellante. Al*

*momento de la inspección la unidad objeto del a querella presentó fallo en la transmisión. La unidad cuando se coloca en "drive" se queda en neutro por unos segundos y luego aplica el cambio de "drive". Solo hace el fallo en "drive" no en reversa.*

*Millaje antes de inspección: 138359*

*Opinión pericial: Lo que está provocando que la transmisión se vaya en neutro cuando se aplica el cambio a "drive" es debido a que los sellos están tostados, duros, no flexibles, y esto provoca que el cambio se tarde más de lo normal.*

*Estimado*
*Piezas-Reparación de transmisión + labor Costo-$2,000.00*

**44. El 13 de octubre de 2023, este Departamento, a través del Técnico Automotriz, Anuedi Ríos Feliciano, llevó a cabo una re-inspección del auto objeto de la querella.**

**45. El día 20 de octubre de 2023, este Departamento notificó el Informe de la Inspección realizad[o], en esta, el Técnico señaló entre otras cosas lo siguiente:**

*El día 13 de octubre de 2023, a las 1:00 PM se realizó una inspección conjunta en la residencia de la parte querellante. Al momento de la inspección se conectó escanear para verifica qué código de fallo presentaba la unidad objeto de la querella.*

*Los códigos de fallo fueron los siguientes:*

*C1201: "Engine control system".*
*C1290: "Zero point of steering sensor".*
*P2714: "Pressure control solenoid D performance or stuck off"*

*Se encendió la unidad para verificar el problema que presenta la transmisión. Al encender la unidad y mover la palanca de los cambios a reversa esta aplicó bien el cambio pero al cambiar a "drive" la transmisión hizo neutro. No se pudo realizar prueba de carretera para verificar la reclamación que alega el querellante, que se queda sin fuerza, porque la unidad al parecer rompió el retenedor del motor y bot[ó] mucho aceite de motor y varilla de aceite estaba por debajo del nivel de lo normal.*

*En cuan[t]o el agua que se filtra hacia dentro de la unidad, querellante le reg[ó] agua con un galón por encima del "sunroof" y no se filtr[ó] nada de agua dentro de la unidad. Luego el querellante us[ó] una manguera para aumentar el riesgo del agua y no se filtró ninguna agua dentro de la unidad.*

*Se verificó cristal delantero y al parecer este tiene un logo que no es el original de Lexus. El logo muestra el cristal delantero es del manufacturero (XYG).*

*Millaje antes de inspección 141113.*

*Opinión Pericial: Recomiendo la reparación de la transmisión. En cuanto el cristal delantero aunque es de diferente marca, no presenta un riego de seguridad, ya que se encuentra en buen estado.*

*Estimado*

*Reparación de Transmisión + Labor Costo $2,000.00 Total $2,000.00*

*46. Durante los meses de junio a diciembre de 2023, el querellante se ausentó 9 días, 6 horas y 45 minutos por licencia ordinaria.*

**47. El 17 de noviembre de 2023, este Departamento, a través del Técnico Automotriz, Aneudi Ríos Feliciano, llevó a cabo una re-inspección del auto objeto de la querella.**

**48. El día 22 de noviembre de 2023, este Departamento notificó el Informe de la Inspección realizada en esta, el Técnico señaló entre otras cosas lo siguiente:**

*"El día 1[7] de noviembre de 2023, a las 1:30 PM se realizó una inspección conjunta en la residencia de la parte querellante. Al momento de la inspección se conectó escaner para verificar qué código de fallo presentaba la unidad objeto de la querella.*

*El código de fallo fue el siguiente:*
*P2714 "Pressure control selenoid D performance or stuck off"*

*No se pudo encender la unidad para verificar el problema que presenta la transmisión, ya que la unidad presentaba batería descargada. No se pudo realizar prueba de carretera para verificar la reclamación que alega el querellante, que se queda sin fuerza, porque la unidad presenta con la batería descargada además al parecer rompió el retenedor del cigüeñal del motor y botó mucho aceite de motor pero querellante le ech[ó] el aceite que le faltaba. En cuanto al agua que se filtra hacia dentro de la unidad, querellante le reg[ó] agua con una manguera por encima del "sunroof" y no se filtr[ó] nada de agua dentro de la unidad. Se verificó cristal delantero y al parecer este tiene un logo que no es el original de Lexus. El logo muestra el cristal delantero es del manufacturero (XYG).*

*Millaje antes de inspección: 141113.*

*Opinión Pericial: Recomiendo la reparación de la transmisión, ya que a mi pensar la transmisión debe tener problemas con los sellos internos. En cuanto al cristal delantero aunque es diferente marca, no presenta un riesgo de seguridad, ya que se encuentra en buen estado.*

*El liqueo de motor fuerte que presenta la unidad no tiene relación con el problema que est[á] teniendo la unidad con la transmisión. La unidad presentó ese liqueo porque el retenedor es una pieza que se debería cambiar a las 60,000 millas, quizás a[ú]n no se le han cambiado y como lo unidad presenta con 141113 millas el retenedor se endureció por el calor y por tal razón empezó a liquiar aceite de motor. Recomiendo el sellando total del motor de combustión.*

*Estimado*
*Reparación de Transmisión + Labor Costo $2,000.00*
*Sellado total de motor de combustión Costo $1,500.00*

**49. El querellante durante su ausencia al trabajo en el año 2023, también se ausentó por razones de enfermedad.**

**50. El querellante incurrió en los siguientes gastos por concepto de comprobantes para el examen teórico de conducir motora:**

*$17.00 sello de rentas internas para examen teórico de motora*

*$17.00 comprobante para licencia provisional*

*El querellante adquirió una renovación de marbete por la suma de $186.00, sin embargo del recibo presentado no se establece a qué vehículo pertenece.*

51. El querellante adquirió chaqueta y pantalón impermeable para ser utilizados al conducir la motora; el querellante pagó $89.18 por ambos artículos.

52. El querellante adquirió unas botas en piel impermeables para conducir la motora, por la suma de $60.20.

53. El querellante adquirió un chaleco y unos guantes fluorescentes para conducir la motora, el querellante pagó $41.19 por estos. Además, adquirió otros guantes, una mascarilla y un cover, todo para usarlo en la motora, pagó por ellos $112.17.

54. El querellante adquirió un sello de autoexpreso por la suma de $20,00, el cual adquirió debido a que para poder conducir la motora tenía que tener una licencia para ello (licencia para conducir motora), y el examen práctico lo ofrecían en el pueblo de Aibonito donde el querellante fue a tomar el mismo.

55. Para tomar el examen práctico, el querellante rentó un apartamento por una noche en un AIRBNB en el pueblo de Barranquitas, ya que el examen práctico era en horas de la mañana y este reside en Sabana Grande. El querellante pagó $103.86 por la renta de una noche.

56. El querellante adquirió dos comprobantes para el examen práctico de conducir motoras, por la suma total de $17.00

57. El querellante obtuvo copia de las llaves de la motora por $6.14.

58. El querellante adquirió una bombilla para la motora por la suma de $27.68.

59. El querellante adquirió un bulto resistente al agua, por el que pagó $100.29, para usarlo mientras conducía la motora.

60. El querellante adquirió un "phone holder" para usar el "GPS" a través de su teléfono en la motora, porque el que pagó $24.44.

61. El querellante adquirió un caso y un chaleco de seguridad para usarlo al conducir la motora, por los que pagó $323.73.

62. El querellante adquirió dos gomas para la motora, porque las que tenía la motora al ser adquirida estaban peladas, por las que pagó un total de $202.26.

63. El querellante adquirió una válvula de presión para las gomas porque las mismas se estaban vaciando, por la que pagó $16.71.

64. El querellante pagó $7.98 por el desmonte de gomas, porque una goma estaba explotada y requería cambiarla.

65. El querellante adquirió unos tubos y "rim strips" por la suma de $70.26, porque quería poner la motora al día para evitar riesgos.

66. El querellante adquirió un amortiguador por la suma de $26.11.

**67. El querellante adquirió un parcho para el tubo de la goma por la cantidad $5.00, debido a que el vecino pinchó el tubo de la goma.**

**68. El 21 de octubre de 2023, el querellante pagó $181.00 para obtener el marbete de la motora.**

**69. El querellante adquirió cajas de bolas y sellos porque las gomas se movían, por las que pagó $77.95.**

**70. El querellante adquirió aceite 10wt standard hydraulic fork para reemplazar el que tenía la motora; pagó por este $18.15.**

**71. El querellante adquirió una junta por la suma de $26.74 porque la motora presentó danos al alternador.**

**72. El querellante adquirió un "generator stator" para la motora por la cantidad de $164.00.**

**73. El querellante le reemplazó el aceite y filtro a la motora, por lo que pagó $45.42.**

**74. El querellante adquirió un tornillo (bolt, flanged) para la motora, por el que pagó $69.68.**

**75. El querellante adquirió el soporte de guardalodo y handles para la motora, por lo que, pagó $103.28.**

**76. El querellante incurrió en gastos legales, por asesorías y consulta de los abogados, Lcdo. Ignacio García, Lcda. Fransheska Ruiz y Lcdo. Pedro Roldós, por la suma total de $340.00.**

**77. El querellante sufrió angustias mentales debido al problema que presentó la transmisión del auto del auto adquirido, que lo privó del uso y disfrute de este, de la falta de transportación para acudir a su trabajo y de haber invertido un dinero en un auto que no pudo utilizar. El querellante ante las angustias mentales y emocionales que experimentaba por el problema del vehículo acudió a recibir ayuda psicológica durante tres sesiones de terapia, pagando un total de $160.00 por las mismas. El querellante fue a dichas tres sesiones de terapia y luego no regresó porque entendía que no recibió la ayuda.**

**78. El querellante se sentía desesperado, con [e]str[é]s y ansiedad, ante el sacrificio de comprar el auto y no poderlo utilizar. Para el querellante, la compraventa del auto en controversia y todos los eventos a consecuencia de la falta de transportación por el problema de la transmisión, fue la peor experiencia de su vida.**

**79. Yiyi Motors era una corporación que operaba para la venta de vehículos, del año 2011 no opera.**

De conformidad con lo anterior, la agencia resolvió que el señor Airando Torres no renunció al derecho de saneamiento por evicción o vicios ocultos. Sobre este asunto, dispuso que este no entendió lo que estaba firmando, pues el vendedor no le explicó en detalle el documento ni qué significaba vicio oculto. Especificó que en el *Contrato de Renuncia a la Garantía y al Derecho de Saneamiento,* el vendedor no marcó ni le informó

al querellante que el auto presentaba un vicio oculto en la transmisión. Por tanto, concluyó que el hecho de que el querellante haya renunciado al derecho de garantía no implicó una renuncia a la obligación de saneamiento. En vista de lo anterior, ordenó que Paris Auto emitiera los siguientes pagos a favor del querellante: (1) $10,000.00 por el precio pagado por el automóvil; (2) $196 por el costo del marbete del auto; (3) $3,160.00 por angustias mentales; (4) $636 por pérdida de ingresos; más (5) $3,607.06 en concepto de daños y perjuicios por la adquisición de una motora, su respectiva indumentaria y equipo, así como el marbete correspondiente, los sellos y comprobantes para los exámenes teóricos y práctico, el costo de peaje y un alquiler a corto plazo.

Oportunamente, el 21 de octubre de 2024, Paris Auto presentó una *Moción de Reconsideración a Resolución.*[6] Argumentó que la reclamación administrativa no debió prosperar, toda vez que el querellante no es merecedor de los remedios concedidos. Alegó que el DACo debió concluir que el señor Airando Torres renunció de modo consciente, informado y por escrito a su derecho a la garantía y saneamiento por vicios ocultos. Reiteró que en este caso no aplicaba la garantía establecida reglamentariamente por el carro ser usado y presentar más de cien mil (100,000) millas corridas.

Por su parte, el 4 de noviembre de 2024, el señor Airando Torres sometió *Oposición a Moción de Reconsideración.*[7] Arguyó que el dictamen no presenta un escenario de aplicación errónea de derecho o reglamento, ni ilegalidad o arbitrariedad. Señaló que las determinaciones de hechos deben sostenerse pues están fundamentadas en el desfile de prueba admitida durante la vista administrativa.

Transcurrido el término dispuesto para atender la reconsideración, el DACo rechazó de plano la solicitud presentada.

---

[6] Este documento consta en la copia certificada del expediente administrativo. Además, también obra en el recurso ante nuestra consideración mediante la Moción en Cumplimiento de Orden sometida por Paris Auto a la cual incluyó copia de la solicitud de reconsideración.
[7] Apéndice de la parte recurrida, págs. 1-8.

Inconforme con el proceder administrativo, el 5 de diciembre de 2024, Paris Auto recurrió ante este Tribunal de Apelaciones. En su *Escrito de Revisión Judicial* esbozó los siguientes señalamientos de error:

1. **ERRÓ DACO AL NO DESESTIMAR LA QUERELLA RELEGANDO SU PROPIO REGLAMENTO DE VEHÍCULOS DE MOTOR QUE DISPONE CUÁNDO TENDRÁ JURISDICCIÓN PARA ACTUAR CONFORME AL MILLAJE.**

2. **ERRÓ DACO AL NO DESESTIMAR LA QUERELLA OBVIANDO EL CONTRATO DE RENUNCIA A LA GARANTÍA Y AL DERECHO DE SANEAMIENTO. (EXHIBIT 05).**

3. **ERRÓ DACO AL VIOLAR EL DEBIDO PROCEDIMIENTO DE LEY QUE LE ASISTE A LA PARTE QUERELLADA, AL NO RESOLVER LOS ESCRITOS DE DESESTIMACIÓN PRESENTADOS, IMPIDIENDO QUE SE PUDIERA RECURRIR DE UNA RESOLUCIÓN RELACIONADA.**

4. **ERRÓ DACO AL VIOLAR EL DEBIDO PROCEDIMIENTO DE LEY QUE LE ASISTE A LA PARTE QUERELLADA, AL NO BRINDAR ACCESO AL EXPEDIENTE DIGITAL, PESE A LAS MÚLTIPLES INSTANCIAS EN QUE SE LE SOLICITÓ.**

5. **ERRÓ DACO AL VIOLAR EL DEBIDO PROCEDIMIENTO DE LEY ADMITIENDO PRUEBA IRRELEVANTE, IMPERTINENTE, ESPECULATIVA Y PRUEBA DE REFERENCIA, PESE A LAS OBJECIONES CONTINUAS DE LA QUERELLANTE.**

6. **ERRÓ DACO AL NO APLICAR EL CASO DEL TRIBUNAL SUPREMO DE LOS ESTADOS UNIDOS LOPER BRIGHT ENTERPRISES V. GINA RAIMONDO, SECRETARY OF COMMERCE 603 U.S. __ (2024), ASUMIENDO JURISDICCIÓN SOBRE LA MATERIA, DONDE NO SE LE HABÍA DELEGADO MEDIANTE SU ACTA HABILITADORA.**

El 17 de diciembre de 2024, esta Curia emitió *Resolución* a los fines de conceder el término de treinta (30) días a la parte recurrida para presentar su alegato. En cumplimiento, el 21 de enero de 2025, el señor Airando Torres presentó su *Alegato en Oposición de Parte Recurrida*. Evaluado el apéndice del recurso presente[8], el 11 de marzo de 2025, dictamos *Resolución* a los fines de ordenar al DACo a presentar la copia certificada del expediente administrativo.

---

[8] Notamos que en este apéndice solo constan los siguientes documentos: (1) *Resolución* objeto de revisión judicial, (2) *Notificación de Resolución*, (3) *Moción de desestimación*, (4) *Orden de Compra de Paris Auto*, y (4) *Contrato de Renuncia a la Garantía y al Derecho de Saneamiento*.

**Sometido el expediente administrativo y con el beneficio de la comparecencia de las partes, procedemos a discutir el marco legal pertinente a la controversia ante nuestra consideración.**

**II.**

**A. Revisión judicial de dictámenes administrativos**

En nuestro ordenamiento apelativo, una parte inconforme con una determinación u orden administrativa final tiene el derecho a recurrir en revisión judicial ante el Tribunal de Apelaciones de Puerto Rico. Véanse Artículo 4.006(c) de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, Ley 201-2003, 4 LPRA sec. 24y; Sección 4.2 de la Ley de Procedimiento Administrativo Uniforme, Ley Núm. 38-2017, 3 LPRA sec. 9672 (LPAU). El derecho a cuestionar la determinación administrativa es parte del debido proceso de ley protegido por la Constitución de Puerto Rico. *ACT v. Prosol et als.*, 210 DPR 897, 908 (2022); *Assoc. Condomines v. Meadows Dev.*, 190 DPR 843, 847 (2014).

En el ejercicio de nuestra facultad revisora, los foros apelativos, como norma general, estamos llamados a conceder amplia deferencia a las decisiones agenciales. *Otero Rivera v. USAA Fed. Savs. Bank*, 2024 TSPR 70, 214 DPR ___ (2024); *OCS v. Point Guard Ins.*, 205 DPR 1005, 1026 (2020)*.* Por lo que, solo es posible sustituir "el criterio de la agencia por el del tribunal revisor cuando no exista una base racional para explicar la decisión administrativa". *Voilí Voilá Corp. et al. v. Mun. Guaynabo*, 213 DPR 743, 754 (2024)*; Capó Cruz v. Jta. Planificación et al.,* 204 DPR 581, 591 (2020). Por ello, usualmente no intervenimos en las determinaciones de hechos siempre y cuando surja del expediente administrativo evidencia sustancial que las respalde. *The Sembler Co. v. Mun. De Carolina,* 185 DPR 800, 821-822 (2012). En ese sentido, la evidencia sustancial es aquella prueba relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión. *Capó Cruz v. Jta. Planificación et al., supra*, pág. 591; *Rebollo v. Yiyi Motors,* 161 DPR 69, 77 (2004).

No obstante, los tribunales revisores apelativos ostentamos autoridad para revisar las conclusiones de derecho en todos sus aspectos de conformidad con la Sección 4.5 de la LPAU, *supra*, 3 LPRA sec. 9675. Es decir, gozamos de facultad para revisarlas completa y absolutamente. *IFCO Recycling v. Aut. Desp. Sólidos,* 184 DPR 712, 745 (2012); *Assoc. Ins. Agencies, Inc. v. Com. Seg*. P.R., 144 DPR 425, 436 (1997). Sin embargo, ello no implica "la sustitución automática del criterio e interpretación del organismo administrativo". *Capó Cruz v. Jta. Planificación et al.*, *supra,* pág. 591; *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 36 (2018).

Ahora bien, no podemos imprimir un sello de corrección a las determinaciones o las interpretaciones administrativas irrazonables, ilegales o contrarias a derecho. *Super Asphalt v. AFI y otro*, 206 DPR 803, 819 (2021). Nuestra deferencia cede cuando: (1) la decisión no está basada en evidencia sustancial; (2) el organismo administrativo ha errado en la aplicación o interpretación de las leyes o reglamentos; (3) ha mediado una actuación arbitraria, irrazonable o ilegal, o (4) la actuación administrativa lesiona derechos constitucionales fundamentales. *Voilí Voilá Corp. et al. v. Mun. Guaynabo, supra,* págs. 754-755; *Super Asphalt v. AFI y otro, supra*, pág. 819.

**B. Apreciación de la prueba en casos administrativos**

Como es sabido, la cuestión de apreciación y credibilidad de una agencia merece nuestra deferencia. *Otero v. Toyota*, 163 DPR 716, 732 (2005). Así pues, la parte que refute judicialmente las determinaciones de hechos tiene el peso prueba para demostrar que no están basadas en el expediente o que las conclusiones a las que llegó la agencia son irrazonables. *OEG v. Martínez Giraud*, 210 DPR 79, 89 (2022). Sobre este particular, el Tribunal Supremo de Puerto Rico ha establecido cuál es el deber de los tribunales revisores ante la apreciación de la prueba:

> [A]l ejercer la revisión judicial los tribunales no pueden descartar de forma absoluta la determinación de una agencia, sino que primero tienen que examinar la totalidad del expediente y determinar si la interpretación de la agencia representó un ejercicio razonable de su discreción administrativa, así fundamentado en la pericia

particular de esta, en consideraciones de política pública o en la apreciación de la prueba. *Voilí Voilá Corp. et al. v. Mun. Guaynabo, supra,* pág. 754.

No obstante, el principio de deferencia a la apreciación de la prueba efectuada por una agencia no es irrestricto. Para intervenir judicialmente debe establecerse que existe otra prueba en el expediente que reduce el valor probatorio hasta tal punto que no sea posible concluir que la determinación fue una razonable de acuerdo con la totalidad de la prueba presentada ante la agencia. J. Echevarría Vargas, *Derecho Administrativo Puertorriqueño*, 5ta ed. rev., San Juan, Ed. SITUM, 2023, pág. 232*.* De no existir ese escenario no debemos alterar la apreciación, pues solo tenemos ante nos los récords mudos e inexpresivos. *SLG Rivera-Pérez v. SLG Díaz-Doe,* 207 DPR 636, 658 (2021); *S.L.G. Rivera Carrasquillo v. A.A.A.*, 177 DPR 345, 356 (2009).

**C. Facultades adjudicativas del DACo**

La Ley Orgánica del Departamento de Asuntos del Consumidor, Ley Núm. 5 del 23 de abril de 1973, 3 LPRA sec. 341, según enmendada (Ley Orgánica de DACo o Ley Núm. 5), faculta a esta agencia a adjudicar las querellas que se traigan ante su consideración y conceder los remedios pertinentes conforme a derecho. 3 LPRA sec. 341e(d). Véanse, además, *Ortiz Rolón v. Soler Auto Sales,* et al.*,* 202 DPR 689, 696 (2019); *Amieiro González v. Pinnacle Real*, 173 DPR 363, 372 (2008). En esa dirección, el DACo tiene el deber de velar por el cumplimiento de todas las leyes relacionadas con los derechos de los consumidores. 3 LPRA sec. 341e(d).

A esos fines, el Artículo 6 de la Ley Núm. 5, *supra*, 3 LPRA sec. 341e(c)(d), establece los poderes delegados a este organismo administrativo:

> (c) Atender, investigar y resolver las quejas y querellas presentadas por los consumidores de bienes y servicios adquiridos o recibidos del sector privado de la economía. Cuando declare con lugar una querella, el Secretario ordenará al querellado perdidoso que haya procedido con temeridad que pague total o parcialmente los gastos incurridos por el Departamento en su tramitación. El Secretario dispondrá por reglamento los cargos por concepto de gastos que deberá pagar el querellado perdidoso.

> (d) Poner en vigor, implementar y vindicar los derechos de los consumidores, tal como están contenidos en todas las leyes

vigentes, a través de una estructura de adjudicación administrativa con plenos poderes para adjudicar las querellas que se traigan ante su consideración y conceder **los remedios pertinentes conforme a Derecho**. Disponiéndose que las facultades conferidas en este inciso podrá delegarlas el Secretario en aquel funcionario que él entienda cualificado para ejercer dichas funciones. No obstante, en caso de reconsideraciones de una determinación final sobre un procedimiento administrativo de naturaleza cuasi judicial o cuasi legislativo, el Secretario podrá delegar la función de evaluar dicha reconsideración únicamente en un funcionario o empleado de la agencia admitido a la práctica legal de la abogacía por el Tribunal Supremo de Puerto Rico. (Énfasis nuestro).

A esos efectos, el Secretario de DACo tiene el deber de establecer las reglas y las normas necesarias para la conducción de los procedimientos administrativos a tenor con el Artículo 6(g) de la Ley Orgánica, 3 LPRA sec. 341e. En cumplimiento del mandato legislativo, el 13 de junio de 2011, el DACo adoptó el Reglamento de Procedimientos Adjudicativos, Reglamento 8034 (Reglamento 8034). Este cuerpo regulador favorece la solución justa, rápida y económica de las querellas presentadas ante el Departamento y provee un procedimiento uniforme. Regla 1, Reglamento 8034, *supra*. Su aplicabilidad se extiende a las investigaciones y los procedimientos administrativos sobre querellas iniciadas por consumidores, o por el DACo. Regla 3, Reglamento 8034, *supra*.

En lo concerniente a la controversia ante nos, el reglamento precitado establece el procedimiento de ventilación de las querellas administrativas como se explica a continuación:

Toda querella se inicia y consulta del querellante o del personal del Departamento, donde se expresan los hechos que motivan la reclamación. El Departamento asesorará al querellante sobre los documentos necesarios para radicar la querella. Regla 5.1, Reglamento 8034, *supra*.

Una vez se presenta una reclamación administrativa con tales componentes, la agencia debe celebrar una vista. En dicho procedimiento es permisible la presentación de material probatorio:

Las partes podrán presentar aquella evidencia documental y testifical incluyendo evidencia de carácter técnico y pericial. El oficial examinador, el Juez Administrativo, Secretario o Panel de Jueces, podrán tomar conocimiento administrativo, a iniciativa propia o a solicitud de parte, sobre aquellos hechos o circunstancias de interés público que son conocidas por todas las personas bien informadas; o que son susceptibles de determinación inmediata y exacta recurriendo a fuentes cuya exactitud no puede ser razonablemente cuestionada. Regla 20.5 de Reglamento 8034, *supra*.

En la celebración de la vista no aplicarán de manera estricta las normas procesales y probatorias según establecido por la Regla 24 del Reglamento 8034, *supra*:

> Las Reglas de Procedimiento Civil y de Evidencian no serán de estricta aplicación a las vistas administrativas, sino en la medida en que el Funcionario o Panel de Jueces que presida la vista o el Departamento estime necesario para llevar a cabo los fines de la justicia.

Celebrada la vista, el Juez Administrativo estará en posición de emitir una resolución que exhiba los siguientes elementos:

> La resolución de la querella en sus méritos contendrá una relación de la determinación de hechos probados, la cual se ajustará y tendrá apoyo en el expediente del procedimiento, conclusiones de derecho, y dispondrá lo que en Derecho proceda para su ejecución mediante una orden e incluirá los apercibimientos para solicitar revisión judicial. Regla 26.1, Reglamento 8034, *supra*.

Tal determinación agencial deberá estar respaldada en evidencia sustancial, es decir, evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión. Regla 4(i), Reglamento 8034, *supra.* En ese dictamen, el DACo tendrá autoridad para conceder los remedios correspondientes:

> Toda resolución otorgará **el remedio que en derecho proceda aun cuando la parte querellante no lo haya solicitado**. Cuando el remedio otorgado sea una orden de hacer o cumplir con un acto determinador deberá contener, (1) cuando surja del expediente o (2) cuando se pueda tener conocimiento administrativo, el importe o valor monetario de la orden, para que en la alternativa de no cumplir con la misma, la parte obligada compense monetariamente. Regla 27.1, Reglamento 8034, *supra*. (Énfasis nuestro).

**C. Concesión de remedio en concepto de daños por parte del DACo**

En virtud de esta facultad adjudicativa, el Tribunal Supremo de Puerto Rico ha validado que el DACo conceda remedios en conceptos de daños y perjuicios, incluso cuando su legislación habilitadora no exprese dicha autoridad, siempre y cuando con dicha acción se adelanten los propósitos de la ley. *Quiñones v. San Rafael Estates, S.E.*, 143 DPR 756, 766 (1997). Véase, también, *Suárez Figueroa v. Sabanera Real Inc.*, 173 DPR 694, 705 (2008). Ahora bien, la concesión de este remedio debe exhibir los criterios de **pertinencia y conforme a derecho**, según establecido en el Artículo 6(d) de la Ley Habilitadora del DACo, *supra*.

(Énfasis suplido). Por ello, el análisis administrativo debe responder al derecho vigente en cuanto a la normativa daños y perjuicios.

Como es reiteradamente discutido, para evaluar la existencia de daños es menester tomar en consideración el elemento de previsibilidad a la luz de la figura de una persona razonable y prudente. *Santiago v. Sup. Grande*, 166 DPR 796, 808 (2006). En estas instancias se debe observar el deber de cuidado exigible consiste en la obligación de todo ser humano de anticipar el peligro de ocasionar daño cuya probabilidad es razonablemente previsible. *López v. Dr. Cañizares*, 163 DPR 119, 113 (2004) (citando a H.M. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. 1, pág. 184). En armonía de estos principios, el Tribunal Supremo de Puerto Rico ha limitado el alcance del principio de previsibilidad de la siguiente manera:

> Es claro que, según hemos expresado, el deber de previsión no se extiende a todo peligro imaginable que pueda amenazar la seguridad de las personas; la norma de responsabilidad es que el riesgo que debe preverse debe estar basado en probabilidades y no en meras posibilidades. *López v. Porrata Doria*, 169 DPR 135, 164-165 (2006).

Este análisis es importante debido a que "[n]o puede ser de otro modo, pues ello implicaría que una persona estaría obligada a prever todos los posibles riesgos que podrían concebiblemente estar presentes en múltiples situaciones, imponiéndole así una responsabilidad absoluta". *Colón y otros v. K-Mart Y otros*, 154 DPR 510, 518 (2001).

### D. Servicio de garantía por la compraventa vehículos de motor

La Exposición de Motivos de la Ley de Garantías de Vehículos de Motor, Ley Núm. 7 de 24 de septiembre de 1979, 10 LPRA sec. 2051, según enmendada, procura la seguridad, la salud y el bienestar de la comunidad al evitar que vehículos de motor defectuosos y de gran potencialidad de daños transiten por nuestras vías públicas. El Artículo 3 de esta pieza legislativa recoge su objetivo de la siguiente manera:

> Es el propósito primordial de esta Ley proteger al consumidor de vehículos de motor nuevos de Puerto Rico, asegurándole que los vehículos de motor que adquiere han de tener las mismas garantías de fábrica que el fabricante o manufacturero otorga a

estos vehículos de motor en los Estados Unidos continentales, y será siempre la que resulte mayor al alcance y amplitud en sus beneficios, independientemente del lugar donde el consumidor adquiera el vehículo, de la persona de quien el consumidor adquiera el mismo y de que el fabricante o manufacturero brinde el servicio de garantía de fábrica en un lugar de Puerto Rico. 10 LPRA sec. 2053.

Cónsono con lo anterior, esta legislación dispone que "[e]s necesario asegurar al consumidor de vehículos de motor que ese producto sirva a los propósitos para los cuales lo adquirió y que reúna las garantías mínimas necesarias en protección de su vida y propiedad". Exposición de Motivos de la Ley de Garantías de Vehículos de Motor, *supra*. Por tal razón, establece que "[l]a garantía de fábrica es una obligación contractual escrita que el fabricante o manufacturero voluntariamente asume para con el consumidor". Íd.

En la consecución de su deber ministerial, el DACo tiene la facultad para adoptar las reglas y los reglamentos que estime necesarios. 10 LPRA sec. 2063. A esos fines, el 6 de junio de 2006, el DACo adoptó el Reglamento de Garantías de Vehículos de Motor, Reglamento 7159.[9] Este cuerpo normativo delimita sus propósitos de la siguiente manera:

(a) Proteger adecuadamente a los consumidores y sus inversiones en la adquisición del vehículo de motor.

(b) Procurar que todo consumidor que compre un vehículo de motor en Puerto Rico, le sirva para los propósitos que fue adquirido, y que reúna las condiciones mínimas para garantizar la protección de su vida y propiedad.

(c) Prevenir las prácticas ilícitas en la venta de vehículos de motor en Puerto Rico. Regla 2, Reglamento 7159, *supra*.

En lo pertinente a la jurisdicción de este caso, la Regla 26 del reglamento aludido dispone lo siguiente:

26.1 Se prohíbe vender un vehículo de motor usado sin garantía.

26.2. Todo vendedor de vehículo de motor usados concederá garantía en piezas y mano de obra. Esta garantía sería será a base del millaje recorrido y según la siguiente escala:

a) Hasta 36,000 millas – cuatro (4) meses o cuatro mil (4,000) millas, lo que ocurra primero.

b) Más de 36,000 millas y hasta 50,000 millas – tres (3) meses o tres mil (3,000) millas, lo que ocurra primero.

---

[9] El 3 de septiembre de 2010, el DACo aprobó el Reglamento 7920 intitulado Enmiendas al Reglamento sobre Garantías de Vehículo de Motor. No obstante, las disposiciones reglamentarias aplicables a esta controversia permanecen inalteradas.

c) Más de 50,000 millas y hasta 100,000 millas – dos (2) meses o dos (2,000) millas, lo que ocurra primero.

Por su parte, la Regla 22 del precitado reglamento establece la facultad que tiene el DACo para ordenar la resolución del contrato en el siguiente contexto:

El Departamento podrá, a opción del comprador, decretar la resolución del contrato o reducir proporcionalmente el precio de venta de acuerdo con el Código Civil de Puerto Rico, en aquellos casos en que el vendedor, distribuidor autorizado o concesionario, distribuidor de fábrica, tuvo oportunidad razonable para reparar uno o más defecto, pero no quiso o no pudo corregirlos. Lo que constituye oportunidad razonable para reparar se determinará tomando en consideración las circunstancias particulares de cada caso. Regla 22, Reglamento 7159, *supra*.

Por último, es menester discutir que, nada de los dispuesto en este reglamento impide el derecho del consumidor para ejercer cualquier acción reconocida en las leyes de nuestro ordenamiento, así como aquellas sobre saneamiento por vicios ocultos o redhibitoria y otras reconocidas en el Código Civil de Puerto Rico a tenor la Regla 37 del Reglamento 7159, *supra*:

Nada de lo dispuesto en este Reglamento limitará en forma alguna el derecho del consumidor a ejercer cualquier acción que le reconozcan las leyes generales o especiales del Estado Libre Asociado de Puerto Rico, así como las acciones de saneamiento por evicción, saneamiento por vicios ocultos o redhibitoria y cualquiera otras que reconozca el Código Civil de Puerto Rico.

Recordemos que las determinaciones de DACo relacionadas con estos asuntos deben estar en armonía con las disposiciones pertinentes del Código Civil y su jurisprudencia interpretativa. *Rodríguez Dilán v. Guacoso Auto Corp.*, 166 DPR 433, 439 (2005). Por ello, la agencia "debe evaluar las acciones de saneamiento presentadas ante sí, ya sea por evicción o vicios ocultos, conforme al Código Civil y su jurisprudencia, a las leyes especiales y a sus propios reglamentos". Íd.

**E. Vicios ocultos en compraventa de vehículo de motor**

El Artículo 1230 del Código Civil (2020), Ley Núm. 55-2020, 31 LPRA sec. 9751, define el contrato como "el negocio jurídico bilateral por el cual dos o más partes expresan su consentimiento en la forma prevista por la ley, para crear, regular, modificar o extinguir obligaciones". Así pues, "[l]o acordado en los contratos tiene fuerza de ley entre las partes, ante sus

sucesores y ante terceros en la forma que dispone la ley. 31 LPRA sec. 9754.

En lo pertinente a la controversia, el Artículo 1274 de la referida ley, dispone que el contrato de compraventa es aquel en el cual la parte vendedora se obliga a transferir a la parte compradora el dominio de un bien, y esta, a su vez, se obliga a pagarle un precio cierto. 31 LPRA sec. 9941. En este tipo de contrato el vendedor está obligado a la entrega y al saneamiento de la cosa vendida. *Rodríguez Dilan v. Guacoso Auto Corp.*, *supra*, pág. 439. Le corresponde en estos casos al vendedor acatar las siguientes obligaciones, según prescrito en el Artículo 1261 del Código Civil, supra, 31 LPRA sec. 9851:

> **La persona que transmite un bien a título oneroso responde por evicción y por los defectos ocultos del bien aunque lo ignorase.**
>
> **Igual obligación se deben entre sí quienes dividen bienes comunes.**
>
> **La persona obligada responde ante el adquirente y quienes lo sucedan en el derecho por cualquier causa y título**. (Énfasis nuestro).

Nótese que el saneamiento por vicios ocultos contempla aquellas situaciones en las que posterior a la entrega se evidencian defectos intrínsecos que exceden las imperfecciones menores que cabe esperar normalmente en un producto determinado. *Polanco v. Cacique Motors*, 165 DPR 156, 166 (2005). Ahora bien, la obligación de saneamiento admite modificación sujeta a los siguientes parámetros de acuerdo con el Artículo 1262 del referido cuerpo legal:

> El transmitente está obligado en los términos del artículo anterior, aunque nada se exprese en el acto de enajenación o división.
>
> Las partes pueden aumentar, disminuir o suprimir esta obligación. **La disminución o supresión de la responsabilidad es inválida si la parte transmitente incurre en dolo**. 31 LPRA sec. 9852. (Énfasis nuestro).

En tales escenarios, la resolución total solo procede si la evicción o el defecto recaen sobre un aspecto determinante para la adquisición del bien a tenor con el Artículo 1263 del Código Civil, *supra*, 31 LPRA sec. 9853. En caso de vicio redhibitorio, el adquirente solo tiene derecho al resarcimiento de los daños sufridos si el transmitente actuó con dolo. Íd.

En esa línea, el Artículo 1164 de la precitada ley establece que el dolo consiste en el incumplimiento deliberado y de mala fe de la obligación. 31 LPRA sec. 9316. Esta disposición reconoce que la responsabilidad procedente del dolo es igualmente exigible en todas las obligaciones. Íd. Por su parte, el Artículo 292 del Código Civil, *supra*, conceptualiza el dolo grave como aquella acción u omisión intencional por la cual una parte o un tercero inducen a otra parte a otorgar un negocio jurídico que de otra manera no hubiera realizado. 31 LPRA sec. 6211.

En las instancias en que la acción u omisión no provoca la realización del negocio jurídico, el perjudicado puede reclamar los daños y perjuicios que sufra. Íd. Ahora bien, la concesión de este remedio fundamentado en una acción de daños *ex contractu* requiere que probar una relación de causalidad:

> **A pesar de esta diferenciación entre la acción de daños extracontractual y la *ex contractu*, ambas comparten sus elementos esenciales. Al igual que en la acción extracontractual, en la *ex contractu* la parte promovente debe probar la existencia de los daños alegados y del incumplimiento culposo o doloso de la obligación contractual. Además, debe existir una relación de causa a efecto entre el incumplimiento y los daños sobrevenidos**. *Muñiz-Olivari v. Stiefel Labs*. 174 DPR 813, 819 (2008). Véase, además, *Cruz, López v. Casa Bella y otros.*, 213 DPR 980, 998-999 (2024). (Énfasis nuestro).

En cuanto a la acción por vicios redhibitorio, es necesario que los defectos excedan las imperfecciones menores que cabe esperar normalmente en un producto determinado, pero no es necesario que dichos defectos imposibiliten el uso de la cosa vendida, siempre que mermen notablemente su valor. *García Reyes v. Cruz Auto Corp*., 173 DPR 870, 891 (2008). A esos fines, el Artículo 1267 del Código Civil, *supra*, conceptualiza el vicio redhibitorio de la siguiente manera:

> Es vicio redhibitorio el defecto oculto en el bien transmitido a título oneroso, existente al tiempo de la adquisición, que hace impropio al bien para su destino o disminuye de tal modo su utilidad que, de haberlo conocido, el adquirente no lo habría adquirido o habría dado menos por él. También se considera vicio redhibitorio:
>
> (a) aquel especialmente acordado como tal por las partes,
> (b) aquel que el transmitente garantiza que no existe, y
>
> (c) la ausencia de la calidad convenida.

El transmitente responde aunque ignore la existencia del vicio redhibitorio. 31 LPRA sec. 9871.

Respecto a la venta de vehículos de motor, el deber de garantía es conocido como saneamiento por evicción y vicios ocultos. *Domínguez v. Caguas Expressway Motors, Inc.*, 148 DPR 387, 395 (1999). En lo pertinente a la controversia, el Tribunal Supremo de Puerto Rico desglosa las condiciones requeridas para ventilar una acción legal de saneamiento por vicios ocultos:

> (1) no deben ser conocidos por el adquirente; (2) el defecto debe ser grave o suficientemente importante para hacer la cosa impropia para el uso a que se le destina o que disminuya de tal modo este uso que, de haberlo conocido el comprador, no la habría comprado o habría dado menos precio por ella; (3) que sea preexistente a la venta, y (4) que se ejercite la acción en el plazo legal, que es el de seis meses contados desde la entrega de la cosa vendida. *García Reyes v. Cruz Auto Corp.*, *supra*, págs., 890-891.

En tal contexto, "el comprador no perito solo está obligado a demostrar que al momento de la compraventa el automóvil funcionaba normalmente, y que el vendedor no quiso o no pudo corregir el defecto a pesar de haber tenido la oportunidad de hacerlo". *Polanco v. Cacique Motors, supra*, pág. 168. Así pues, solamente le compete probar que el automóvil que compró no funcionaba en forma normal y que el vendedor tuvo oportunidad de corregir los defectos y no pudo o no los corrigió. *García Reyes v. Cruz Auto Corp.*, *supra*, pág. 891.

**III.**

En el presente recurso, Paris Auto alega que el DACo carecía de jurisdicción para ventilar el caso pues el vehículo de motor de la querella presenta exceso de millaje. Considera que se debió desestimar la reclamación a tenor con *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). Sin embargo, indica que sus escritos de desestimación no se atendieron. En los méritos del caso, contiende que la partes suscribieron un acuerdo de renuncia a garantía, lo cual implicó una renuncia al derecho de saneamiento por vicios ocultos. Por último, aduce que la agencia incidió al admitir prueba irrelevante y especulativa para conceder un remedio basado en daños por la compraventa de una motora y demás asuntos relacionados.

En oposición, el señor Airando Torres expresa que la agencia ostenta autoridad para ventilar al amparo del Código Civil como permite el Reglamento de Garantías de Vehículos de Motor. Puntualiza que su renuncia al derecho de garantía y saneamiento no fue inteligente ni informada debidamente. Además, señala que en contrato alcanzado no se incluyeron las circunstancias reales sobre la mecánica del automóvil. Enfatiza que de haber conocido tales condiciones hubiera estado en una posición adecuada previo a adquirir la unidad vehicular en cuestión.

En consideración al caso que nos ocupa, tenemos el deber de ejercer nuestra función revisora para evaluar el proceder del DACo. A los fines de atender los argumentos levantados, nos corresponde en primer lugar discutir conjuntamente los señalamientos de error (1), (2), (3) y (6) relativos a la jurisdicción. Eventualmente, abordaremos independientemente los errores (4) y (5).

Así puntualizado, adelantamos que la agencia actuó conforme a derecho al asumir la jurisdicción. Por tanto, no procedía la desestimación de la *Querella*. Veamos.

Un análisis detenido del expediente administrativo permite corroborar que el DACo resolvió oportunamente las solicitudes desestimatorias presentadas por la parte recurrente. Destacamos que la agencia declaró *No Ha Lugar* su solicitud de desestimación en una *Orden* emitida el 15 de abril de 2024 y en la *Resolución* dictada 4 de octubre de 2024. A la luz de ese tracto procesal, determinamos que no se cometió ese error ni se incidió en el debido proceso de ley como argumenta la Paris Auto.

De igual manera, precisamos que el caso de *Loper Bright Enterprises v. Raimondo*, *supra*, no priva al DACo de atender la reclamación presentada como asegura Paris Auto. Este precedente federal se limita a resolver que los tribunales no tenemos que adoptar el estándar de deferencia en aquellas determinaciones efectuadas por las agencias en torno a leyes ambiguas. Resaltamos en efecto que este dictamen

jurisprudencial en ninguna instancia impide al DACo de ejercer su deber ministerial.

En esa línea de los argumentos jurisdiccionales, establecemos la facultad adjudicativa del DACo no surgió de la Regla 26 del Reglamento de Garantías de Vehículos de Motor, *supra*, concerniente al criterio de millaje. La jurisdicción emanó de la Regla 37 del precitado cuerpo legal que le autoriza a ventilar los reclamos conforme al Código Civil. Por tanto, la agencia resolvió correctamente al determinar que el criterio del millaje es inconsecuente para atender este caso:

> El Reglamento de Garantías de Motor permite la aplicación de las acciones de saneamiento por vicios ocultos o redhibitorios, saneamiento por evicción, y cualquier otra reconocida en el Código Civil de Puerto Rico. Por lo cual, aun habiéndose vendido el auto objeto de la querella con más de 100,000 millas recorridas, este Departamento tiene autoridad y jurisdicción para atender la presente querella a la luz del Código Civil.[10]

Lo anterior nos permite, a su vez, determinar que la *Querella* se atendió como una acción legal fundamentada en una acción legal en torno a saneamiento por vicios ocultos más daños y perjuicios. Destacamos al respecto que el Artículo 1261 del Código Civil, *supra*, dispone que "[l]a persona que transmite un bien a título oneroso responde por evicción y por los defectos ocultos del bien aunque lo ignorase".

En virtud de la citada disposición, el DACo examinó la reclamación presentada por el señor Airando Torres. Durante este proceso evaluativo, tuvo ante su consideración una serie de informes de inspección efectuados por la agencia en los que se recomienda la reparación de la transmisión de la unidad vehicular.[11] Destacamos sobre este particular que el *Informe de Reinspección Vehículo de Motor* rendido a base de una opinión pericial el 22 de noviembre de 2023 y sometido ante nos por la parte recurrida establece que procede la reparación de la mecánica vehicular:

> Recomiendo la reparación de la transmisión, ya que a mi pensar debe tener problemas con los sellos internos. En cuanto el cristal delantero aunque es de diferente marca, no presenta un riesgo de seguridad ya que se encuentra en un buen estado. El liqueo de motor fuerte que presenta la unidad no tiene una relación con el problema que está teniendo la unidad con la transmisión. La unidad presentó ese liqueo porque el retenedor es una pieza se debería

---

[10] Apéndice de la parte recurrente, pág. 3.
[11] Apéndice de la parte recurrida, págs. 9-34.

cambiar a las 60,000 millas, quizás aún no se lo han cambiado y como la unidad presenta con 141113 millas el retenedor se endureció por el calor y por tal razón empezó a liquiar aceite de motor. Recomiendo el sellado total del motor de combustión.[12]

En consistencia con lo anterior y conforme a la prueba oral y documental obrante en el expediente, el DACo emitió el dictamen objeto de revisión judicial en el que surge el siguiente pronunciamiento:

Considerando las circunstancias que rodearon la compraventa del vehículo de motor en la presente querella, se concluye que la renuncia de la parte querellante al saneamiento por vicios ocultos no fue válida, ya que la misma no cumplió con los estándares mínimos de información al comprador. Quedó claramente establecido con la prueba, que la parte querellada durante la negociación para la compraventa le aseguró al querellante, que la unidad estaba buena de mecánica que desconocía sobre la correa de tiempo, cuando el querellante le cuestionó si el auto estaba bueno de transmisión y correa de tiempo. La afirmación del vendedor que la unidad estaba buena de mecánica fue razón para que el querellante adquiriera el auto. Por su parte. el vendedor del querellado le indico al querellante que no se preocupara por el documento que firmaba de contrato de renuncia al derecho a saneamiento, porque eso era algo administrativo. Por lo cual, la parte querellante no renunció de forma consciente, informada, inteligente y al derecho a saneamiento por vicios ocultos.

Conforme a la prueba presentada durante la vista administrativa, se demostró que el auto adquirido presentó problema, al día siguiente de haberse adquirido el mismo. La prueba demostró que al día siguiente de la compraventa, el auto patinaba y a los dos días de adquirido presentó un fuerte golpe y temblaba al correr. Surge de la prueba, que el auto adquirido por el querellante presentó un grave defecto en la transmisión que impidió que el mismo se utilizado para el propósito que fue adquirido. De acuerdo a la prueba, la transmisión presentaba problemas, la cual fue diagnosticada por tres talleres diferentes, y por el Técnico del DACO. Los tres talleres y el Técnico del DACO coincidieron que el vehículo presentaba un problema en la transmisión; que requería reparación, y los estimados de costo de reparación ascendían desde $1,087.80 hasta los $6,797.06. [13]

Como explicamos con anterioridad, tal adjudicación procede de la amplia evidencia sustancial sometida por la parte recurrida para prevalecer en su contención y demostrar que Paris Auto incurrió en una actuación dolosa para otorgar el negocio jurídico en contravención del Artículo 292 del Código Civil, *supra.* La prueba obrante en el expediente nos dirige a concluir que el señor Airando Torres no hubiera suscrito el *Contrato de Renuncia a la Garantía y el Derecho de Saneamiento* de haber conocido el vicio oculto en la trasmisión automovilística. En vista de ese escenario, disponemos que el proceder agencial responde a una base racional que

---

[12] Apéndice de la parte recurrida, págs. 33-34.
[13] Apéndice de la parte recurrente, pág. 20.

faculta la resolución contrato por razón de vicio oculto cuando este recae en un aspecto determinante del vehículo de motor de conformidad con el Artículo 1263 del Código Civil, *supra*. Por ende, no intervendremos en esta parte del dictamen toda vez que no exhibe una actuación agencial arbitraria, ilegal o irrazonable. Igualmente es cónsono con la normativa reseñada sobre los contratos de compraventas.

Atendido lo anterior, nos compete discutir el señalamiento de error (5) concerniente a la admisión de prueba irrelevante y especulativa a pesar de las alegadas objeciones que levantó la parte querellada. En la consideración de este señalamiento, precisamos que Paris Auto no presentó ante este Tribunal de Apelaciones la totalidad de los documentos admitidos ante la agencia ni sometió una transcripción para evaluar la prueba oral desfilada. Solo tenemos ante nos la copia certificada del expediente administrativo que solicitamos en virtud de un decreto emitido por este foro intermedio apelativo. Por tal motivo, nos encontramos imposibilitados de intervenir en la apreciación de la prueba testimonial. Ahora bien, en cuanto a la prueba documental nos encontramos en idéntica posición que el organismo administrativo para efectuar nuestra función revisora, tal como se establece en *Trinidad v. Chade*, *supra*, pág. 292. Así que, haremos nuestra evaluación al respecto.

Surge del expediente administrativo que el señor Airando Torres presentó prueba documental, entiéndase unos recibos de transacciones concerniente a los gastos incurridos por no contar con su automóvil. A base de ese material probatorio, el DACo ejerció su facultad de conceder remedios. A esos efectos, conviene repasar que ordenó la resolución del contrato de compraventa más la compensación monetaria por razón pago efectuado (1) para adquirir el automóvil objeto del litigio, (3) daños por angustias mentales como se permite en las acciones legales *ex contractu* y (3) pérdida de ingresos, entre otros extremos.

Sin embargo, notamos que en un ejercicio excesivo en derecho, el DACo concedió un remedio adicional en concepto de daños y perjuicios tras la adquisición de una motora:

> [S]e ordena a la parte querellada entregar a la parte querellante la suma de $10,000.00 (precio pagado por el auto), mas $3,160.00 por angustias y daños mentales. 3636.00 por pérdida de ingreso por ausencias al trabajo, $196.00 del marbete del auto, **$3,607.06 por los daños de adquirir una motora, su indumentaria y equipos, así como su marbete, sellos y comprobantes para los exámenes teóricos y práctico, autoexpreso y renta de Airbnb para tomar el examen práctico**.[14] (Énfasis nuestro).

Sobre este asunto, somos conscientes de que la agencia recurrida ostenta autoridad legal para conceder remedios en concepto de daños y perjuicios siempre y cuando ese proceder se ajuste al derecho vigente y adelante los propósitos de la ley habilitadora. *Quiñones v. San Rafael Estates, S.E.*, *supra*, pág. No obstante, debemos destacar que el otorgamiento de los remedios debe fundamentarse en los criterios rectores de **pertinencia y conforme** a derecho según preceptúa el Artículo 6(d) de la Ley Orgánica del DACo, *supra*.

A la luz de esa normativa, disponemos que el remedio concedido se aparta de los principios de previsibilidad y causalidad requeridos en daños y perjuicios. Ciertamente, no era un hecho previsible que el señor Airando Torres experimentara daños adicionales tras la adquisición de su motora como determinó erradamente el DACo. Tampoco existe una relación fáctica de causa y efecto entre la actuación dolosa adjudicada y los daños sobrevenidos como consecuencia de la compra de una motora que no es el vehículo de motor objeto del litigio. Véanse, además, *Muñiz-Olivari v. Stiefel Labs*, *supra*, pág. 819; *López v. Casa Bella y otros, supra, págs.* 998-999.

Por tanto, concluimos que el remedio concedido se distancia notoriamente de la norma que establece que el deber de previsión no incluye aquel daño inimaginable. *López v. Porrata Doria*, *supra*, págs. 164-165. En efecto, la suma otorgada por razón de un agravio aislado al pleito resulta imprevisible dentro de un examen de probabilidades y

---

[14] Apéndice de la parte recurrente, pág. 25.

razonabilidad. Resolvemos, además, que la prueba admitida a los fines de sostener este remedio contraviene con la Regla 401 de Evidencia, 32 LPRA Ap. VI, R. 401, que preceptúa el requisito de evidencia pertinente.[15] Por constituir un remedio excesivo e impertinente, decretamos la eliminación de la partida de $3,607.06 en concepto de daños por la adquisición de la motora, su indumentaria y equipos, así como su marbete, sellos y comprobantes para los exámenes teóricos y práctico, el costo del peaje y renta a corto plazo.[16]

Por último, Paris Auto argumenta en su señalamiento de error (4) que se violó su debido proceso de ley al no brindar acceso al expediente digital, pese a sus múltiples solicitudes. La parte recurrida no nos ha colocado en posición para atender ese señalamiento. Por tanto, nos vemos imposibilitados de ejercer nuestra función revisora sobre tal argumento.

En vista de lo anterior, modificamos la determinación administrativa a los fines de eliminar la cuantía de $3,607.06 concernientes con la adjudicación de los daños adjudicados tras la adquisición de una motora y demás gastos relacionados. Así modificada, confirmamos el resto de la *Resolución*, toda vez que descansa en la prueba sustancial obrante el expediente, por lo que, merece nuestra deferencia.

**IV.**

Por los fundamentos que anteceden, **modificamos** la *Resolución* a los fines de eliminar la suma de $3,607.06 en concepto de daños y perjuicios por la compra de la motora y demás gastos relacionados con esta adquisición. Así modificada, **confirmamos** el dictamen recurrido.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[15] Reconocemos que las Reglas de Evidencia no obligan ante los procedimientos administrativo. No obstante, ello no implica que el DACo tiene facultad para hacer abstracción irrazonablemente del principio probatorio de pertinencia.
[16] Apéndice de la parte recurrente, pág. 25.